## Case No. 17,353a.

WEEKS et al. v. The NEW ORLEANS.[1]

Circuit Court, S. D. New York. July 31, 1879.[2]

COLLISION—STEAMER AND SAIL—ABSENCE OF LOOKOUT—REPAIRS.

[1. A steamer colliding with a schooner, in broad daylight, on the open ocean, *held* solely in fault; it appearing that her lookout had been withdrawn, that the man at the wheel did not observe the schooner until warned by a cry from her, and that the schooner steadily maintained her course until in extremis.]

[2. An injured vessel is not necessarily bound to employ such persons to make repairs as those in fault for her injuries see fit to recommend; and, when the recommendation is not made until after others have been engaged to do the work, the fact that the persons recommended offer to make the repairs for a less sum is not conclusive that the amount paid was too much.]

[Appeal from the district court of the United States for the Southern district of New York.

[This was a libel by John S. Weeks and others against the steamer New Orleans to recover damages for a collision.]

### Facts Found by the Court.

(1) A little after 5 o'clock in the morning of the 6th of September, 1874, a collision occurred between the schooner Allie Blackmore, owned by the libellants, and the steamer New Orleans, in the Atlantic Ocean, about 40 miles southeasterly from Cape Henlopen. (2) The schooner had a carrying capacity of over 600 tons, though she registered only 390, or thereabouts. She was less than a year old, and bound on a voyage from Fernandina, Fla., to New York, with a full load of pine lumber, stowed below and on deck. (3) The steamship was 245 feet long, and of 1,448 tons burden. She was on one of her regular trips between New York and New Orleans. (4) When the collision occurred, it was broad daylight; and a vessel without lights might have been seen at least two miles away. The wind was very light from the southward and eastward, but a considerable swell was rolling from the southwest. (5) The course of the schooner was about N. E. by N. She had all sails set, but there was not wind enough to keep them full, and she was not making more than a mile and

[1] [Not previously reported.]

[2] [Affirming Case No. 10,179. Decree of circuit court affirmed by supreme court in 106 U. S. 13, 1 Sup. Ct. 90.]

a half or two miles an hour. Her lights were properly set and burning, and she was in all respects well equipped and manned. (6) The course of the steamer was about S. by W. ½ W., and her speed 11 miles, or a little more, an hour. This was full speed. About 20 minutes before the collision, her lookout was withdrawn from his station on the forecastle, and set to work, with all the other men then on watch, washing decks. The second officer, whose watch it was, was with his men, superintending their work. From the time the lookout was withdrawn, there was no one where he could in any respect perform that duty, except the man at the wheel, and he did not discover the schooner until his attention was called to her by the mate at the time and in the manner hereinafter stated. (7) When the vessels were two or three miles apart, the steamer was discovered and duly reported by the lookout on the schooner. From that time she was closely watched. The schooner was kept steadily on her course until the steamer was not more than seven or eight hundred feet away, when, the danger of collision being imminent, the second mate, who was on deck, gave an order to luff, and at the same time called out in alarm to the steamer; but, before any material change in her course had been made, the vessels came together. (8) The schooner was not seen at all from the steamer until the second mate, hearing the cry of alarm which came from her, stepped from where he was standing on the main deck to the starboard side, and saw her close upon him. He immediately ran up from the main deck into the wheel house, where he ordered the wheel to port at the same time, assisting to put it over himself. The order to port aroused the captain, who was in a room opening out of the wheel house; and he, without stopping to put anything on, opened his door, and, seeing the schooner, rang the proper bells to slow and stop. Before the course of the steamer was materially changed by the porting of the wheel, or her headway visibly affected, she struck the schooner on the port bow, between the stern and the cathead, and cut into her about 20 feet on a line but slightly angling across the keel. The wound extended very nearly to the foremast, and to within 5 feet of the keel. (9) In a short time the steamer took the schooner in tow, and carried her to the Delaware breakwater. From there she was taken by a tug to Philadelphia, where she was unloaded, and her cargo taken on to New York. She was also put in repair and refitted at that port. (10) The account of damages as stated by the commissioner in his report is sustained by the evidence, except the item of $1,000 for damages to the starboard side. As to that, the evidence shows that when the repairs were completed the vessel was in as good general condition as she was before the collision, and that if the bill of Birely, Hillman & Streaker is paid in full, without the deduction of $600 for increase of value, full compensation will be made for any injury to the starboard side.

## Conclusions of Law.

(1) That the collision was caused solely by the fault of the New Orleans in not keeping a sufficient lookout, and in not seeing the schooner in time to keep out of her way. (2) That the libellants are entitled to recover for the amount of the decree below, with interest on $14,026.92 from the date of that decree at the rate of 6 per cent. per annum. [See Case No. 10,179.] (3) As both parties have appealed, and the decree below is sustained, the costs of this court must be equally divided between the parties.

[On May 25, 1877, a decree was filed which merely disposed of certain of complainants' exceptions. Case No. 10,178.]

Scudder & Carter, for Weeks.
Man & Parsons, for the steamer.

WAITE, Circuit Justice. The facts, as found, are clearly established by the evidence, and satisfy me, beyond all doubt, that the failure of the steamer to keep a sufficient lookout was the sole cause of the collision. The order on the schoner to luff could not have contributed at all to the accident, and, if it did, made as it was in extremis, was not in law a fault. With her sails shaking for want of wind, and the sea rolling, it is impossible to believe that any change of her speed could have affected materially her course in the short time that intervened between the hail from her deck, heard on the steamer, and the coming together of the vessels. When this hail was given, it would take the steamer less than a minute at the speed she was going to reach the schooner. This is shown, not only by the estimates of the distance made at the time by those on both vessels, but by what transpired meanwhile. As soon as the second mate on the steamer heard the hail, he looked over the starboard side, saw the schooner, ran from the deck to the wheel house, gave the order to port, and himself helped to put the wheel over; but before the steamer, at her rate of speed, and steering easily, changed her course materially, the collision occurred. The captain, as soon as he heard the order to port, got up, opened the door from his room into the wheel house, saw the danger, and rang the bells to stop and back; but, before any perceptible change in the motion of the steamer, the vessels were together. The order to luff was not given until just about the time of the hail from the schooner, and probably a little after. The second mate says his order to luff was given, and the next thing "she struck us," and this is the effect of all the evidence upon this branch of the case. I place no confidence whatever in anything said by Oberg or Potter in conflict with the other testimony. They are very clearly unreliable.

Upon the questions arising on the exceptions to the commissioner's report, I think the judge below was right in his rulings. An injured vessel is not necessarily bound to employ such persons to make her repairs as those in fault for her injuries see fit to recommend. In this case the claimants would not admit their liability, and did not offer to make the repairs themselves. All they did was to say that if Pusey, Jones & Co. made the repairs, and they were liable, they would not dispute the bills. The tender of Pusey, Jones & Co. to do the work was not communicated to the libellants until after the schooner had been unloaded, and Birly, Hillman & Stracker employed to do the work. While the amount of the bill seems large, it is sustained by the evidence. The libellants disputed it, and would not pay until they had been sued, and judgment recovered against them. While this judgment may not conclude the claimants, it tends to show there was no collusion. The offer of Pusey, Jones & Co. to do the work for a less sum than it actually cost is not conclusive evidence that it cost too much. If the libellants show that they acted in good faith, that no more was done than was necessary to put their vessel in as good condition as she was before the collision, and that the prices paid were reasonable, they have made out their case. This I think they have done.

As to the allowance of $1,000 for damages to the starboard side, I think, with the district judge, that after the repairs were completed the vessel was, on the whole, in as good a condition as she was before she was injured. The port side was left in a better condition, and, if the extra expense thus incurred is allowed and paid, it will compensate for any unrepaired damage to the other side.

The evidence as to what Gore swore to on the trial of the suit instituted by Birely, Hillman & Streaker to recover the amount of their bill was properly ruled out. He testified to what he believed to be errors in the bill, but the result showed he must have been mistaken as judgment was given against him notwithstanding his evidence. Under such circumstances, his statements, even though made upon oath, can hardly be treated as admissions to overcome positive evidence as to what the facts really were.

This disposes substantially of all the questions relied upon by the claimants in their argument on this appeal. The demurrer allowed is, I think, sustained by the evidence, as is also the ship chandler's bill. The exceptions to the allowance for storage of timber in Philadelphia for transporting cargo to New York, and for the loss of freight have not been insisted on here. None of the exceptions taken by the libellants should, in my opinion, be allowed, except the 10th, which relates to the abatement of $600 from the bill of Birely, Hillman & Streaker on account of the increased value of the schooner after her repairs. That has already been considered. As to the interest on the sum allowed for demurrage, I think, under the circumstances, it was properly rejected. The amount allowed is sufficient, under the evidence, to cover interest to the date of the report.

On the whole, I think the decree of the dis-

trict court ought not to be disturbed. An entry may be prepared giving judgment in favor of the libellants for the amount of the decree below, and interest at 6 per cent. on the amount. in the aggregate, of all the different items of damage allowed by the district court, exclusive of the interest allowed and put into the decree. This amount I make $14,026.92. It is, however, subject to correction in case any error shall be discovered.

The decree will be for: (1) Decree below, $15,904.98. (2) Interest on $14,026.92 from June 11, 1877. to date of decree. (3) Costs in the district court.

As both parties have appealed, and the decree of the district court has been sustained, the costs in this court will be divided.

[NOTE. The libellants subsequently moved for a summary judgment against the sureties upon the appeal bond, which motion was denied, as having been made prematurely. Case No. 10,181. From the decree of this court affirming Case No. 10,179, an appeal was taken to the supreme court, where the decree was affirmed. 106 U. S. 13, 1 Sup. Ct. 90.]